**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| WALTER PSENCIK and TRAVIS PSENCIK,<br><br>       Plaintiffs,<br><br>  vs.<br><br>CORTEVA, INC.; SYNGENTA CROP PROTECTION AG; SYNGENTA CORP.; SYNGENTA CROP PROTECTION, LLC; CHS INC.; NUTRIEN AG SOLUTIONS, INC.; DOE DEFENDANT WHOLESALERS 1-5; AND DOE DEFENDANT RETAILERS 6-10,<br><br>       Defendants. | CIVIL ACTION NO. 1:22-cv-2423<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

## TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................................. 1

JURISDICTION AND VENUE ........................................................................................ 4

INTERSTATE COMMERCE ........................................................................................... 5

PARTIES ........................................................................................................................... 5

FACTUAL ALLEGATIONS ............................................................................................ 7

    I.    OVERVIEW OF THE CROP PROTECTION INDUSTRY ......................................... 7

        A.  Crop Protection Products ............................................................................. 7

        B.  Crop Protection Product Manufacturers ..................................................... 9

        C.  The Regulatory Process for Crop Protection Products ............................... 9

        D.  The Traditional Distribution Channel ....................................................... 11

        E.  Life Cycle Management of Crop-Protection Products ............................. 12

    II.   DEFENDANTS' ANTICOMPETIVE ACTIONS ....................................................... 13

        A.  Corteva's Loyalty Program ....................................................................... 14

        B.  Syngenta's Loyalty Program ..................................................................... 15

        C.  Market Effects of Loyalty Programs ......................................................... 15

            1.      Corteva CPPs Subject to Corteva's Loyalty Program ................... 17

            2.      Syngenta CPPs Subject to the Key AI Loyalty Program ............. 20

RELEVANT MARKETS .................................................................................................. 23

ANTITRUST INJURY ..................................................................................................... 26

CLASS ACTION ALLEGATIONS ................................................................................. 27

CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT ..................... 33

CLAIMS FOR RELIEF ................................................................................................... 35

       COUNT ONE  VIOLATION OF SECTION 1 OF THE SHERMAN ACT
       (15 U.S.C. § 1) (Against All Defendants) ..................................................... 35

COUNT TWO VIOLATION OF SECTION 2 OF THE SHERMAN ACT
(15 U.S.C. § 2) —MONOPOLIZATION (Against Corteva) ....................................... 38

COUNT THREE VIOLATION OF SECTION 2 OF THE SHERMAN ACT
(15 U.S.C. § 2)—MONOPOLIZATION (Against Syngenta) ...................................... 39

PRAYER FOR RELIEF .............................................................................................. 41

DEMAND FOR JURY TRIAL ................................................................................... 42

Plaintiffs Walter Psencik and Travis Psenick ("Plaintiffs") bring this action on behalf of themselves and a proposed Class of similarly situated direct purchasers of certain crop protection products ("CPPs") manufactured by Defendant manufacturers Corteva, Inc. ("Corteva") and Syngenta Crop Protection AG, Syngenta Corp., and Syngenta Crop Protection, LLC (collectively, "Syngenta," and collectively with Corteva, the "Manufacturer Defendants"), and the generic versions of those CPPs, distributed and sold by entities including the Manufacturer Defendants' co-conspirators Defendants CHS Inc. ("CHS"), Nutrien Ag Solutions, Inc. ("Nutrien"), Doe Defendant Wholesalers 1-5, and Doe Defendant Retailers 6-10 (collectively, with Corteva and Syngenta, "Defendants."). Plaintiffs and the proposed Class were harmed by having to purchase CPPs at prices that were inflated due to Defendants' anticompetitive conduct as alleged herein. Plaintiffs allege as follows based on personal knowledge, the investigation of Plaintiffs' counsel, and on information and belief.

## NATURE OF THE ACTION

1.      Defendants Corteva and Syngenta each manufacture CPPs, including agricultural pesticides, herbicides and fungicides, that are used by many American farmers. For many years, Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta") and Corteva, Inc. ("Corteva") have unfairly impeded competitors and artificially inflated the prices that U.S. farmers pay for crop-protection products. Defendants do this by deploying a set of so-called "loyalty programs," which are designed to severely limit the availability of lower-priced generic products. Through this scheme, Defendants have suppressed generic competition and maintained monopolies long after their lawful exclusive rights to particular crop-protection products have expired. These unlawful business practices have cost farmers many millions of dollars a year on their purchases of CPPs containing active ingredients

1

rimsulfuron, oxamyl, acetochlor, azoxystrobin, mesotrione, metolachlor, or s-metolachlor (the "Relevant AIs").  CPPs containing the Relevant AIs are referred to herein as the "Relevant CPPs."

2.     Every year, U.S. farmers purchase over ten billion dollars of CPPs to improve crop yields and food security in the United States.

3.     Defendants manufacture CPPs that contain unique active ingredients.  A crop-protection product manufacturer that researches, develops, and patents new active ingredients is known as a "basic" manufacturer.  Syngenta and Corteva are basic manufacturers, and they are among the largest crop-protection product manufacturers in the United States and globally.  In 2021, Syngenta had $3.03 billion in CPP sales in North America, and $13.3 billion globally.[1] Corteva had $2.5 billion in CPP sales in North America and $7.25 billion globally.[2]

4.     Defendants' CPPs and the active ingredients therein enjoyed a period of patent protection and regulatory protection under which they were lawfully protected from competition. Congress has enacted a comprehensive regulatory regime for the crop-protection industry that promotes the twin goals of product innovation and price competition.  "Basic" manufacturers like Defendants Syngenta and Corteva initially develop, patent, and register the active ingredients within crop-protection products.  They may then exploit the commercial potential of their innovations through lawfully obtained exclusive rights for a period of years.  After patent and regulatory exclusivity periods expire, generic manufacturers may enter the market with equivalent products containing the same active ingredients and relying upon the same toxicology and environmental impact data.  Unimpeded competition from generic products predictably leads to

---

[1] *Financial Report 2021*, Syngenta, 6 (2021), https://www.syngenta.com/sites/syngenta/files/bond-investor-information/financial-results/Syngenta-AG-2021-Financial-Report.pdf

[2] *Keep Growing, Corteva Annual Report 2021*, Corteva Investors, 1 (2021), https://investors.corteva.com/static-files/fb19f308-4766-4ca6-a3d6-bd0a8035f09a

dramatic price reductions. This regulatory structure thus incentivizes innovation while encouraging price and other competition—all of which benefits U.S. farmers and consumers.

5.      Defendants systematically undermine and frustrate the goals of this system. In order for Defendants Corteva and Syngenta to maintain their market dominance even after their patent and regulatory exclusivities on their CPPs expired, Defendants used "loyalty programs" under which they made substantial payments to their wholesalers, and in certain cases also retailers, in exchange for the wholesalers and retailers agreeing to strictly limit their purchases of generic versions of Defendants' CPPs. These loyalty programs ensured that Defendants' far more expensive branded CPPs would comprise the majority of sales to wholesalers and retailers, and their respective customers.

6.      Since a small number of wholesalers control a very large share of all sales of CPPs to retailers that sell to farmers, and some of the wholesalers also own a large number of their own retail outlets, loyalty programs in effect for a particular CPP foreclose generic CPP manufacturers from nearly all of the retail market for that CPP. The other channels available to generic CPP manufacturers to get their products to market are far more limited. When there is a loyalty program in place for a particular CPP, the generic CPP manufacturers can typically only sell much smaller volumes of that CPP, or often cannot sell it profitably at all, requiring them to exit the market or to not enter it in the first place. Defendants CHS and Nutrien, which are both wholesalers and retailers, participated in these loyalty programs.

7.      Therefore, the Manufacturer Defendants' "loyalty payment" system has the following effects: (1) the Manufacturer Defendants are able to maintain a near-monopoly for the sales of each of these CPPs even though the patent and regulatory protection have expired and there should be open competition from generics; (2) the Manufacturer Defendants are able to

3

continue to charge much higher prices for those CPPs as a result of excluding most generic competition; (3) the Manufacturer Defendants obtain supracompetitive profits as a result; (4) the Manufacturer Defendants share part of those supracompetitive profits with the Wholesaler Defendants (and in Syngenta's program, also the Retailer Defendants) to ensure their cooperation with this scheme; (5) farmers have to pay much higher prices for those branded CPPs than they would if there was the open competition that would occur absent Defendants' conduct; and (6) the lesser amounts of generic versions of those CPPs that are able to be sold are also priced higher than they would be if there was the open competition that would occur absent Defendants' conduct.

8.      Defendants' anticompetitive scheme has reduced competition in the market for the CPPs discussed herein and thereby artificially inflated the price of those CPPs and of the generic competitors to those CPPs.  Plaintiffs and members of the proposed Class have been injured by paying artificially inflated prices for their CPP purchases.

9.      On September 29, 2022, following an investigation, the FTC filed a complaint against Defendants alleging that Defendants' loyalty programs foreclose generic competition and result in higher prices for farmers in violation of federal and state antitrust laws.[3]

## JURISDICTION AND VENUE

10.      Plaintiffs bring claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

11.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15

---

[3] Complaint, *FTC v. Syngenta Crop Protection AG*, 22 Civ. 00828 (M.D.N.C. Sept. 29, 2022), ECF No. 1.

U.S.C. §§ 15 and 22, as Defendants reside, transact business, committed an illegal or tortious act, have agents, and/or can be found in this District.

12.    This Court has personal  jurisdiction over Defendants because they transact business in this District, Corteva's headquarters are located in this District, and many of the decisions and policies giving rise to the claims herein occurred in this District.

## INTERSTATE COMMERCE

13.    Defendants engage in interstate commerce and activities substantially affecting interstate commerce in the national market for CPPs.  Defendants Corteva and Syngenta sell their CPPs to wholesalers, who sell them to retailers, who sell them to farmers in all 50 states. Defendant CHS is a wholesaler and retailer that sells agricultural products including CPPs to farmers and operates in 16 states.  Defendant Nutrien is a wholesaler and retailer that sells agricultural products including CPPs to farmers and operates in at least 45 states.  Defendants' manufacture, distribution, and sale of CPPs involves a continuous and uninterrupted flow of commerce across state lines.  Defendants' anticompetitive actions have had a substantial effect on interstate trade and commerce in the markets for the CPPs discussed herein.

## PARTIES

14.    **Plaintiff Walter Psencik** is a resident of Texas who purchased CPPs from Defendant Nutrien during the Class Period at prices that were artificially inflated as a result of Defendants' anticompetitive scheme, and thereby suffered antitrust injury.

15.    **Plaintiff Travis Psencik** is a resident of Texas who purchased CPPs from Defendant Nutrien during the Class Period at prices that were artificially inflated as a result of Defendants' anticompetitive scheme, and thereby suffered antitrust injury.

16.    **Defendant Corteva, Inc.** is a publicly held Delaware corporation based in Indianapolis, Indiana, in this District.  Corteva is the successor company to the agriscience

businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"), which merged to form DowDupont in 2017, and subsequently split into Corteva and Dupont in 2019. Corteva is involved in the research and development, manufacture, sale, and marketing of CPPs.

17.     **Defendant Syngenta Crop Protection AG** is a Swiss aktiengesellschaft (public limited company), headquartered in Basel, Switzerland. Since in or about May 2021, Syngenta Crop Protection AG has been an indirect subsidiary of Sinochem Holdings Corporation Ltd., a global chemical company based in Beijing, China.  Syngenta Crop Protection AG has its North American headquarters in Greensboro, NC.

18.     **Defendant Syngenta Corporation** is a Delaware corporation headquartered in Wilmington, Delaware and is an affiliate of Syngenta Crop Protection AG.

19.     **Defendant Syngenta Crop Protection, LLC** is a Delaware LLC based in Greensboro, North Carolina and is an affiliate of Syngenta Crop Protection AG.

20.     Defendants Syngenta Crop Protection AG, Syngenta Corp. and Syngenta Crop Protection, LLC each transact or transacted business in this District, and each of them is involved in the research and development, manufacture, sale, and marketing of CPPs.

21.     **Defendant CHS Inc. ("CHS")** is an agricultural cooperative organized in Minnesota and based in Inver Grove Heights, Minnesota.  CHS transacts business in 16 states, including Indiana, and transacts business in this District.  CHS is both a wholesaler and retailer of CPPs including the Relevant CPPs (defined below).

22.     **Defendant Nutrien Ag Solutions, Inc. ("Nutrien")** is a Delaware corporation based in Loveland, Colorado and is a subsidiary of Canadian company Nutrien Ltd. based in Saskatoon, Saskatchewan, Canada.  Nutrien transacts business in at least 45 states, including

Indiana, and transacts business in this District.  Nutrien is both a wholesaler and retailer of CPPs including the Relevant CPPs.

23.    **Defendant Doe Wholesalers 1-5** (together with CHS and Nutrien, the "Wholesaler Defendants") are five other major national wholesalers of CPPs, whose identity will be confirmed, who conspired with the Manufacturer Defendants to effectuate the loyalty payment scheme described herein.  Certain of the **Doe Wholesalers 1-5** are also major national retailers of CPPs including the Relevant CPPs.

24.    **Defendant Doe Retailers 6-10** (together with CHS and Nutrien, the "Retailer Defendants") are five other major national retailers of CPPs, whose identity will be confirmed, who conspired with the Manufacturer Defendants to effectuate the loyalty payment scheme described herein.

## FACTUAL ALLEGATIONS

### I.    OVERVIEW OF THE CROP PROTECTION INDUSTRY

#### A.    Crop Protection Products

25.    A pesticide is a chemical used to kill or control a "pest"—a disease, weed, insect, or other unwanted organism.  The large majority of pesticides sold in the United States are used for crop protection.

26.    Farmers (or "growers") use pesticides to control pests that would otherwise harm their crops.  Pesticides used for crop protection are referred to herein as "crop protection products" (previously defined as, "CPPs").  CPPs are vitally important inputs for American farmers.  Use of effective crop-protection products allows farmers to dramatically increase crop yields and quality, contributing to a stable food supply.

27.    CPPs fall into three main categories: herbicides, which target unwanted plants or weeds; insecticides, which target insect infestations (including nematicides, which target

nematodes (roundworms)); and fungicides, which target fungal diseases.

28.    A crop-protection product contains at least one active ingredient, which is the chemical substance that kills or controls the targeted pest. Active ingredients are combined with inert components such as water, adjuvants, surfactants, and in some cases other active ingredients, to formulate finished crop-protection products. Finished crop- protection products that contain only one active ingredient are referred to as "straight goods," while products containing two or more active ingredients are called "mixtures."

29.    An active ingredient may also be sold in "technical grade" or for "manufacturing use," before being formulated into a finished crop-protection product. Active ingredients sold in this form require additional processing before they can be used by farmers in finished crop-protection products.

30.    Several criteria serve to distinguish active ingredients from each other. These include the pest(s) targeted by an active ingredient; the effectiveness of an active ingredient at controlling the targeted pest, which is often measured in terms of crop yield improvements; the crops upon which an active ingredient is suited and registered to be used, which may correlate with geography; the stage of the growing cycle at which an active ingredient may be used; and the performance of an active ingredient under prevailing climate and weather conditions.

31.    Each active ingredient has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest. While active ingredients that share a common mode of action tend to have similar use cases, there are often differences in performance and other reasons why one active ingredient cannot readily replace another for a given application or in a given condition. Farmers may prefer one active ingredient over another for various reasons, including the specific performance

characteristics of the active ingredient or a farmer's past success with an active ingredient. As a result, a chemically equivalent generic crop protection product is a closer substitute for a given branded product than is a product containing a different active ingredient.

### B.    Crop Protection Product Manufacturers

32.    CPP manufacturers create, market, and sell crop protection products. They may synthesize the active ingredients for their formulated products in their own facilities or purchase the active ingredients from other chemical manufacturers.

33.    A CPP manufacturer that researches, develops, and patents new active ingredients is known as a "basic" manufacturer. Syngenta and Corteva are basic manufacturers, and they are among the largest crop-protection product manufacturers in the United States and globally.

34.    Generic manufacturers primarily sell crop-protection products containing active ingredients initially developed by others and as to which patent and regulatory exclusive-use periods have expired (sometimes called "post-patent" active ingredients). More than a dozen generic manufacturers sell crop-protection products in the United States.

### C.    The Regulatory Process for Crop Protection Products

35.    The congressionally enacted patent and regulatory framework governing crop protection products rewards innovation by granting the developer of a new active ingredient protection from competition in that active ingredient for a period of years. But the governing legal framework also contains mechanisms intended to facilitate generic entry and price competition when exclusivity periods end.

36.    The Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C.S. § 136a, *et seq.* ("FIFRA"), is a federal regulatory scheme that also seeks to reward innovation while guaranteeing the safety of CPPs. FIFRA generally requires that a CPP be registered with the EPA before it can be sold or distributed.

37.     In order to sell or distribute a CPP in the United States, a manufacturer must conduct research studies about the CPP's toxicity and environmental impact, and then submit that information to the Environmental Protection Agency (EPA), and the EPA reviews that information prior to approving that CPP. *See* FIFRA § 3(c)(1)(F)(ii).  FIFRA allows applicants that register pesticides with new active ingredients the right to "exclusive use" of any data used to support the registration of a new ingredient for a period of ten years that can be extended under certain circumstances.  FIFRA § (c)(1)(F)(i)-(ii).  The exclusive use period precludes other companies from relying on the data and studies submitted during the exclusive use period.

38.     When a basic manufacturer develops a new active ingredient, it can apply for U.S. patent protection for a term beginning when the patent issues and expiring twenty years after the initial patent application.

39.     The effect of the exclusive use period is that the basic manufacturer that obtains the approval has a ten-year exclusive period that can and often does last after the expiration of the patent.  This regulatory exclusive-use period often extends beyond the basic manufacturer's patent term and effectively extends the basic manufacturer's right to be the exclusive supplier of products containing that active ingredient.

40.     After both the patent protection and FIFRA ten-year period on an active ingredient have expired, a generic manufacturer can get approvals to enter the market by using the same data that the basic manufacturer originally submitted.  This process is a much faster, easier, and cheaper than a company having to conduct its own research studies.

41.     When the basic manufacturer's relevant patent and regulatory exclusive-use terms expire, a generic manufacturer may enter the market with crop-protection products containing the same active ingredient.  Those products may be generic equivalents of branded crop-protection

products or may combine the active ingredient with other active ingredients to create new mixtures. A generic entrant must apply to register its product for sale in the United States under FIFRA, but FIFRA permits generic entrants to rely on data that the original registrant submitted to the EPA. The original registrant, in turn, may be entitled to receive data "compensation" payments from the generic firm, depending on the timing of the generic entrant's reliance on the data. This reflects FIFRA's objective of facilitating generic entry and thus encouraging competition.

### D. The Traditional Distribution Channel

42. In general, CPP manufacturers sell to distributors that in turn sell to (and in some cases are integrated with) a much larger number of retail outlets dispersed across the country in close proximity to farmers. This path to market is referred to as the traditional distribution channel, or just the "channel." Sales through the traditional distribution channel account for approximately 90% or more of all sales of crop-protection products in the United States. Just seven distributors account for over 90% of sales through the traditional channel, and thus account for approximately 80% or more of all sales of crop-protection products in the United States.

43. Selling through distributors is the most efficient way for a crop-protection product manufacturer to reach farmers.

(a) Distributors typically offer services and functions such as warehousing, transportation, credit, and marketing.

(b) Distributors give manufacturers access to a network of retail and farmer customers, and to the logistics networks required to service widely dispersed customers. By selling through a relatively small number of distributors, a crop-protection product manufacturer can reach thousands of retailers, and in turn, hundreds of thousands of farms.

(c)     Distributors provide scale and services that would require substantial investments for a manufacturer to replicate. Crop-protection product manufacturers cannot efficiently compete by circumventing the traditional distribution channel and focusing primarily on direct sales to local retailers or farmers.

44.     CHS and Nutrien are both wholesalers and retailers of CPPs.

45.     Farms and farmers then buy CPPs from those retail outlets, including CHS and Nutrien and other Retailer Defendants.

46.     This "traditional" distribution channel is responsible for about 90% of all sales of CPPs in the United States.

47.     The wholesalers are by far the best way for a CPP manufacturer to reach the target market of farmers. A CPP manufacturer only has to sell through a few large wholesalers to access a large percentage of all retail outlets serving the vast majority of American farmers. The wholesalers either own their own retail stores or have longstanding relationships with retailers that facilitate their sales of CPPs, and they have a massive infrastructure to support their distribution and sales of CPPs, including logistics, storage facilities, financing, and promotions. CPP manufacturers would encounter huge difficulties and costs trying to develop those capabilities on their own, and it would be far less efficient for them to try to sell directly to retailers or farmers.

**E.     Life Cycle Management of Crop-Protection Products**

48.     Generic crop protection products are generally sold at significantly lower prices than equivalent branded products. Accordingly, to the extent generic manufacturers are able to gain market access with respect to a given active ingredient, their entry generally sparks price competition and causes the price and sales volume of branded products containing that active ingredient to decline. This in turn causes the associated profits of basic manufacturers to decline.

49.    Brand manufacturers engage in corporate strategy planning called "life cycle management" for a branded CPP.  This can be done in a perfectly legal and pro-competitive manner, such as determining how a CPP's pricing should change, and how much in promotional expenses should be devoted to that CPP, at different points in its exclusivity period.  However, it can also involve anticompetitive methods designed to prevent or delay generic entry or prevent generic entrants from being able to access the market effectively.

## II.    DEFENDANTS' ANTICOMPETIVE ACTIONS

50.    Corteva and Syngenta each use "loyalty programs" that are designed to severely limit the distribution of—and ultimately, farmers' ability to purchase—competing generic products.  Corteva and Syngenta designed and administer their loyalty program with the purpose, intent, and expectation that the program will impede generic competition and thereby maintain market prices and branded market share at levels higher than would otherwise prevail, despite the expiration of applicable patent and regulatory exclusive-use terms.  Each does so for its own benefit and for the benefit of its distributor partners.

51.    The Manufacturer Defendants' loyalty programs were established with the intention of maintaining monopoly or near-monopoly exclusivity for their CPPs even after the patent and regulatory protection on those CPPs expired.

52.    The loyalty programs involve a Manufacturer Defendant making large payments to CHS, Nutrien, or another wholesaler or retailer that agreed to strictly limit its purchases of certain generic CPPs that would compete with the Manufacturer Defendant's CPPs that have lost patent and regulatory protection.  These large "bonus" payments were a conduit for the Manufacturer Defendants to share monopoly profits with the Wholesaler Defendants and Retailer Defendants in order to secure their cooperation with the scheme described herein.

13

53.     Defendants' loyalty programs are designed to marginalize generic manufacturers and enable Defendants to retain share while pricing their crop-protection products above competitive levels. As to active ingredients that are the primary focus of this Complaint, each Defendant has substantially achieved these goals. Through its loyalty program, each Defendant has substantially impeded generic manufacturers from providing effective competition and has maintained prices for crop protection products above competitive levels.

54.     Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

### A.     Corteva's Loyalty Program

55.     Corteva's loyalty program is intended to, and does in fact, exclude or minimize generic competition for Corteva CPPs that have lost patent and regulatory exclusivity.

56.     Under Corteva's loyalty program, wholesalers must make a very high percentage of their purchases of each of those CPPs from Corteva to get loyalty payments, thereby causing them to limit their purchases of generic competitors of those CPPs to a very low percentage share of their overall purchases of those CPPs.

57.     As a result of excluding or minimizing generic competition, Corteva is able to continue to charge high prices for its CPPs even after they have lost patent and regulatory exclusivity, and still maintain high market share, allowing it to gain supracompetitive profits that it would not receive if there was open competition with generic competitors across the distribution chain.

58.     Corteva uses these incentive payments to wholesalers (including wholesalers who operate retail outlets, such as CHS and Nutrien) to encourage the cooperation of wholesalers in

this scheme, sharing part of its supracompetitive profits with them in exchange for their role in excluding generic competition and allowing those supracompetitive profits to continue.

### B.    Syngenta's Loyalty Program

59.    Syngenta's loyalty program is called the "Key AI" program.

60.    Syngenta allows both wholesalers and retailers to participate in the Key AI program.

61.    The Key AI program is intended to, and does in fact, exclude or minimize generic competition for Syngenta CPPs that have lost patent and regulatory exclusivity.

62.    Under the Key AI program, wholesalers and retailers must make a very high percentage of their purchases of each of those CPPs to be Syngenta's branded CPPs to get loyalty payments, thereby causing them to limit their purchases of generic competitors of those CPPs to a very low percentage share of their overall purchases of those CPPs.

63.    As a result of excluding or minimizing generic competition, Syngenta is able to continue to charge high prices for its CPPs even after they have lost patent and regulatory exclusivity, and still maintain high market share, allowing it to gain supracompetitive profits that it would not receive if there was open competition with generic competitors across the distribution chain.

64.    Syngenta uses these incentive payments to wholesalers and retailers to encourage the cooperation of wholesalers and retailers in this scheme, sharing part of its supracompetitive profits with them in exchange for their role in excluding generic competition and allowing those supracompetitive profits to continue.

### C.    Market Effects of Loyalty Programs

65.    Corteva and Syngenta have entered into loyalty agreements with all major wholesalers of CPPs in the United States, including CHS, Nutrien, Wholesalers 1-5, and in

Syngenta's case, also Retailers 6-10. Corteva has entered into loyalty agreements with major wholesalers that are also major national retailers of CPPs, including CHS and Nutrien.

66. Since the major wholesalers have such a large market share of the traditional distribution channel and thereby control a very large share of all sales of CPPs to farmers, this gives Corteva and Syngenta's loyalty agreements a substantial marketwide effect and serves to greatly restrict competition for the Relevant CPPs, resulting in higher prices for farmers and increased profits for Corteva and Syngenta.

67. The fact that the major wholesalers know that all of their competitors participate in these loyalty programs means that each major wholesaler knows that no one wholesaler will want to leave the loyalty program agreements and sell lower priced generics instead, because this would undermine the entire scheme and jeopardize the large profits that the wholesalers obtain from the loyalty programs.

68. Since the loyalty program requirements are typically that the wholesaler must purchase a very high share of its CPPs containing a particular Relevant AI from Corteva or Syngenta or risk losing a very large incentive payment, wholesalers often avoid any risk of missing the required share by not dealing with generic competitors at all, or by minimizing their purchases and interactions with them and their promotion of generic products.

69. Since the loyalty program requirements are typically that the retailer must purchase a very high share of Syngenta CPPs out of its total purchases of CPPs containing a particular Relevant AI or risk losing a very large incentive payment, retailers often avoid any risk of missing the required share by not dealing with generic competitors at all, or by minimizing their purchases and interactions with them and their promotion of generic products.

70.     Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

### 1.     Corteva CPPs Subject to Corteva's Loyalty Program

71.     Corteva's loyalty program includes CPPs using three specific active ingredients for which patent and regulatory exclusivities have expired: rimsulfuron, oxamyl, and acetochlor.

72.     Rimsulfuron is an herbicide that is used to hinder weed growth in various types of crop fields including fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes.

73.     After Corteva's patent and regulatory exclusivity for rimsulfuron expired, generic manufacturers introduced generic versions of CPPs containing rimsulfuron that were priced significantly lower than Corteva's branded versions.

74.     However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing rimsulfuron, despite their products having the same active ingredient(s) and being much cheaper.

75.     In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers strictly limit purchases of CPPs containing generic rimsulfuron or don't purchase generics at all, don't promote generic CPPs containing rimsulfuron, and encourage their customers to buy Corteva's CPPs containing rimsulfuron rather than generic competitors.

76.     This has effectively minimized generic competition for Corteva in the market for CPPs containing rimsulfuron.

77.    This greatly reduced competition has resulted in much higher profits for Corteva from CPPs containing rimsulfuron than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

78.    Oxamyl is an insecticide and nematicide used to control pests in various crop fields, particularly cotton fields and fruit and vegetable fields.

79.    After Corteva's patent and regulatory exclusivity for oxamyl expired, generic manufacturers introduced generic versions of CPPs containing oxamyl that were priced significantly lower than Corteva's branded versions.

80.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing oxamyl, despite their products having the same active ingredient and being much cheaper.

81.    In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers strictly limit purchases of generic CPPs containing oxamyl or don't purchase generics at all, don't promote generic CPPs containing oxamyl, and encourage their customers to buy Corteva's CPPs containing oxamyl rather than generic competitors.

82.    This has effectively minimized generic competition for Corteva in the market for CPPs containing oxamyl.

83.    This greatly reduced competition has resulted in much higher profits for Corteva from CPPs containing oxamyl than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

84.    Acetochlor is an herbicide that inhibits weed growth particularly in corn fields, but also in fields of crops such as soybeans and sugar beets.

85.     Corteva and Bayer are partners in a joint venture that owns the U.S. registration for acetochlor; Bayer does the actual manufacturing of acetochlor, and Corteva sells CPPs containing acetochlor that are subject to loyalty program agreements as described herein.

86.     After Corteva and Bayer's patent and regulatory exclusivity for acetochlor expired, generic manufacturers introduced generic versions of CPPs containing acetochlor that were priced significantly lower than Corteva's branded versions.

87.     However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing acetochlor, despite their products having the same active ingredient(s) and being much cheaper.

88.     In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers strictly limit purchases of generic CPPs containing acetochlor or don't purchase generics at all, don't promote generic CPPs containing acetochlor, and encourage their customers to buy Corteva CPPs containing acetochlor rather than generic competitors.

89.     This has effectively minimized generic competition for Corteva in the market for CPPs containing acetochlor and has also caused generic manufacturers to postpone or cancel introducing CPPs containing acetochlor to the United States market.

90.     This greatly reduced competition has resulted in much higher profits for Corteva from CPPs containing acetochlor than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

91.     CHS, Nutrien, and other Wholesaler Defendants and Retailer Defendants have received loyalty payments from Corteva as a result of their cooperation with Corteva's restraint of

trade; CHS, Nutrien and other Wholesaler Defendants and Retailer Defendants have thereby profited from their willing participation in Corteva's scheme.

### 2. Syngenta CPPs Subject to the Key AI Loyalty Program

92. Syngenta's Key AI loyalty program includes CPPs containing three active ingredients for which patent and regulatory exclusivities have expired: azoxystrobin, mesotrione, and metolachlor (and s-metolachlor, as will be explained below).

93. Azoxystrobin is a fungicide that is used to kill and control fungal diseases on crops.

94. After Syngenta's patent and regulatory exclusivity for azoxystrobin expired, generic manufacturers introduced generic versions of CPPs containing azoxystrobin that were priced significantly lower than Syngenta's branded versions.

95. However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing azoxystrobin, despite their products having the same active ingredient(s) and being much cheaper.

96. In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limit purchases of generic CPPs containing azoxystrobin or don't purchase generics at all, don't promote generic CPPs containing azoxystrobin, and encourage their customers to buy Syngenta's CPPs containing azoxystrobin rather than generic competitors.

97. This has effectively minimized generic competition for Syngenta in the market for CPPs containing azoxystrobin and has also caused at least one generic manufacturer to not introduce an azoxystrobin product to the United States market.

98. This greatly reduced competition has resulted in much higher profits for Syngenta from CPPs containing azoxystrobin than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

99.    Mesotrione is an herbicide that controls common weeds in corn fields.

100.    After Syngenta's patent and regulatory exclusivity for mesotrione expired, generic manufacturers introduced generic versions of CPPs containing mesotrione that were priced significantly lower than Syngenta's branded versions.

101.    However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing mesotrione, despite their products having the same active ingredient(s) and being much cheaper.

102.    In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limit purchases of generic CPPs containing mesotrione or don't purchase generics at all, don't promote generic CPPs containing mesotrione, and encourage their customers to buy Syngenta's CPPs containing mesotrione rather than generic competitors.

103.    This has effectively minimized generic competition for Syngenta in the market for CPPs containing mesotrione and has also caused at least two generic manufacturers to postpone or cancel introducing a mesotrione product to the United States market.

104.    This greatly reduced competition has resulted in much higher profits for Syngenta from CPPs containing mesotrione than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

105.    Metolachlor is an herbicide that controls common weeds in various crop fields, including corn, soybeans, and sorghum.

106.    Products containing "metolachlor" contains a 50-50 mixture of s-metolachlor and r-metolachlor, which have identical molecular makeups but are arranged differently (similar to a left and right glove).  Syngenta's CPPs contain predominantly s-metolachlor (88% s-metolachlor

and 12% r-metolachlor). CPPs using predominantly s-metolachlor are far more effective at killing weeds than CPPs that use the mixed version of metolachlor.

107. After Syngenta's patent and regulatory exclusivity for metolachlor expired, generic manufacturers introduced generic versions of CPPs containing metolachlor that were priced significantly lower than Syngenta's branded versions.

108. After Syngenta's patent and regulatory exclusivity for s-metolachlor expired, generic manufacturers introduced generic versions of CPPs containing s-metolachlor that were priced significantly lower than Syngenta's branded versions.

109. However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the markets for CPPs containing metolachlor and s-metolachlor, despite their products having the same active ingredient(s) and being much cheaper.

110. In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limited purchases of generic CPPs containing metolachlor or don't purchase generics at all, didn't promote generic CPPs containing metolachlor, and encouraged their customers to buy Syngenta's CPPs containing metolachlor rather than generic competitors.

111. In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limit purchases of generic CPPs containing s-metolachlor or do not purchase generics at all, do not promote generic CPPs containing s-metolachlor, and encourage their customers to buy Syngenta's CPPs containing s-metolachlor rather than generic competitors.

112. This has effectively minimized generic competition for Syngenta in the market for CPPs containing metolachlor and s-metolachlor, and it has also caused generic manufacturers to postpone or cancel introducing metolachlor products to the United States market.

113. This greatly reduced competition has resulted in much higher profits for Syngenta from CPPs containing metolachlor and s-metolachlor than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

114. CHS, Nutrien, and other Wholesaler Defendants and Retailer Defendants have received loyalty payments from Syngenta as a result of their cooperation with Syngenta's restraint of trade; CHS, Nutrien, and other Wholesaler Defendants and Retailer Defendants have thereby profited from their willing participation in Syngenta's scheme.

## RELEVANT MARKETS

115. At all relevant times, Corteva had market power and monopoly power in the markets for CPPs containing rimuslfuron and oxamyl, and market power in the market for CPPs containing acetochlor. Corteva had the power to maintain the price of those CPPs at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as each of those CPPs.

116. At all relevant times, Syngenta had market power and monopoly power in the markets for CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor. Syngenta had the power to maintain the price of those CPPs at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as each of those CPPs.

117. Direct evidence of each Defendant's monopoly and market power in the relevant markets includes each Defendant's ability to price Relevant AIs and CPPs containing those Relevant AIs above competitive levels and to exclude competition from generic manufacturers

23

through operation of its loyalty program.

118.    Each Defendant's monopoly and market power is also shown through circumstantial evidence, including dominant or substantial market shares in relevant markets with substantial barriers to entry.

119.    To the extent Plaintiffs' claims require the definition of a relevant market, the relevant product markets are the markets for EPA-registered CPPs for sale in the United States that contain each of the specific Relevant AIs.  For example, for the Relevant AI azoxystrobin, the relevant product market is the market for EPA-registered CPPs for sale in the United States that contain azoxystrobin, including Syngenta's CPPs containing azoxystrobin and any generic versions of those CPPs.

120.    To the extent Plaintiffs' claims require the definition of a relevant market, the relevant geographic market is the United States.  The EPA has to approve CPPs for sale and use in the United States, and farmers in the United States are not allowed to legally use CPPs from other countries that have not been approved for sale and use in the United States.  Therefore, the price of CPPs in other countries does not affect the market for CPPs in the United States.

121.    The Manufacturer Defendants have a very high market share in the markets for CPPs containing each of the Relevant AIs, despite the fact that those CPPs do not currently possess patent and regulatory exclusivities.    There are significant barriers to entry for generic manufacturers being able to enter the market for any CPP, in addition to patent and regulatory barriers, including the need for EPA registration, access to supplies of active and inactive ingredients, manufacturing facilities and know-how, and the ability to distribute products effectively.  Defendants' actions have also created further effective barriers to entry for generic

competitors for the Relevant CPPs that prevents them from accessing the traditional distribution channel and being able to compete effectively in those markets.

122.    For each of the Relevant CPPs, its only reasonable substitute is a generic version of that Relevant CPP.  Other CPPs with different active ingredients will affect different types of weeds or pests, be suitable for different climate and weather conditions or types of crop fields, and/or have different modes of action in terms of the chemical and biological reactions they use to target particular weeds or pests and therefore would obtain different results than the particular Relevant CPP in question.

123.    Azoxystrobin is differentiated from other CPPs used for similar purposes in that it can be used with all major row crops, making application easier, and it also is claimed to have growth-promoting effects on crops not proven in other active ingredients.

124.    Mesotrione is differentiated from other CPPs used for similar purposes due to its greater efficacy and crop safety and lower use rate than other CPPs.

125.    Metolachlor is differentiated from other CPPs used for similar purposes due to its greater solubility in water (which improves its performance in drier conditions), its better performance in warmer conditions, and its ability to be used with a wider variety of crop fields.

126.    S-metolachlor shares the advantages of metolachlor but has even greater efficacy in killing weeds.

127.    Rimsulfuron is differentiated from other CPPs used for similar purposes due to the fact that it controls a wider spectrum of weeds, can be used with a wider variety of crop fields, can be used preemptively to prevent weed growth as well to control an existing weed problem, and is inexpensive to produce compared to other, similar herbicide active ingredients.

128.    Oxamyl is differentiated from other CPPs used for similar purposes in that it is safer for crops and better for soil health, and it can be sprayed directly onto crops instead of applied at root level or in the soil.

129.    Acetochlor is differentiated from other CPPs used for similar purposes due to its superior performance in wetter or cooler conditions, its greater efficacy against particular types of weeds, and its greater efficacy earlier in the growing season.

130.    A small but significant and non-transitory artificial inflation of the price of any of the Relevant CPPs would not cause any significant number of consumers to purchase CPPs with different active ingredients so as to make such price inflation unprofitable.  A small but significant and non-transitory artificial inflation of the price of any CPPs with different active ingredients than the Relevant CPPs would not cause any significant number of consumers to purchase the Relevant CPPs instead so as to make the artificial price inflation unprofitable.

## ANTITRUST INJURY

131.    Defendants Corteva and Syngenta's loyalty programs were intended to, and did in fact, exclude or minimize generic competition for the Relevant CPPs.

132.    Due to Corteva and Syngenta's loyalty programs excluding or minimizing generic competition for each of the Relevant CPPs, and doing so with the cooperation of the Wholesaler Defendants and Retailer Defendants, Plaintiffs and other members of the proposed Class have had to pay and continue to pay artificially inflated prices for each of those Relevant CPPs and for their generic competitors as compared to the prices that would exist absent those loyalty programs if there was open competition from generic competitors across the distribution chain.  This injury is ongoing.

133.    Plaintiffs and other members of the proposed Class have sustained substantial losses and damage to their business and property in the form of those overcharges on their

26

purchases of Relevant CPPs and their generic competitors.    The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

134.    The price of the Relevant CPPs and their generic competitors have been, and will continue to be, artificially inflated as a result of the Defendants' anticompetitive conduct.    The inflated prices that the Plaintiffs and other members of the proposed Class have paid for the Relevant CPPs and their generic competitors, and will continue to pay until Defendants' conduct ceases, are the foreseeable result of Defendants' anticompetitive conduct.

## CLASS ACTION ALLEGATIONS

135.    Plaintiffs brings this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and (b) as representative of a Class defined as follows:

> All persons or entities in the United States that purchased CPPs containing rimsulfuron, oxamyl, or acetochlor, or CPPs containing azoxystrobin, mesotrione, metolachlor, or s-metolachlor, directly from CHS, Nutrien, or any other wholesaler or retailer that was subject to a loyalty program with Syngenta or Corteva during the period beginning at least as early as January 1, 2017 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period").    Excluded from the Class are: (1) any Judge or Magistrate presiding over the class action and members of their families; (2) Defendant and its subsidiaries, parents, successors, predecessors, or any entity in which Defendant has a controlling interest; (3) persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors, or assigns of such excluded persons.

136.    The members of the Class are so numerous that joinder is impracticable.    The class is reasonably estimated to include hundreds of thousands of farms in the United States that purchased the Relevant CPPs and generic competitors to the Relevant CPPs during the Class Period.

137.    Because the claims of each member of the Class have a common origin and share a common basis, there are numerous questions of law and fact that are common to the Class under

Federal Rule of Civil Procedure 23(a)(2), and that predominate over any issues affecting individual members of the Class under Federal Rule of Civil Procedure 23(b), including, *inter alia*:

a.    Whether Corteva, CHS, Nutrien, Wholesalers 1-5, and Retailers 6-10 conspired to restrain trade in the markets for CPPs containing rimsulfuron, oxamyl, and acetochlor;

b.    Whether Corteva's loyalty program was intended to exclude or minimize generic competition for CPPs containing rimsulfuron, oxamyl, and acetochlor;

c.    Whether Corteva's loyalty program did in fact exclude or minimize generic competition for CPPs containing rimsulfuron, oxamyl, and acetochlor;

d.    Whether Corteva's actions caused the retail price of CPPs containing rimsulfuron, oxamyl, and acetochlor to increase above competitive levels;

e.    Whether, after Corteva's lawfully obtained patent and regulatory exclusivities for CPPs containing each of rimsulfuron, oxamyl, and acetochlor had expired, it continued to have market power in the markets for CPPs containing each of those active ingredients;

f.    Whether, after Corteva's lawfully obtained patent and regulatory exclusivities for CPPs containing each of rimsulfuron and oxamyl had expired, it continued to have monopoly power in the markets for CPPs containing each of those active ingredients;

g.    Whether Corteva willfully acquired and maintained monopoly power in the markets for CPPs containing each of rimsulfuron and oxamyl, after its lawfully obtained patent and regulatory exclusivities on those CPPs had expired, by means of its loyalty programs;

h.    Whether Corteva's loyalty program has a legitimate pro-competitive justification;

       i.     Whether the conduct alleged herein artificially maintained, preserved, or enhanced Corteva's market power in the markets for CPPs containing each of rimsulfuron, oxamyl, and acetochlor;

       j.     Whether Syngenta, CHS, Nutrien, Wholesalers 1-5, and Retailers 6-10 conspired to restrain trade in the markets for CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor;

       k.     Whether Syngenta's loyalty program was intended to exclude or minimize generic competition for CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor;

       l.     Whether Syngenta's loyalty program did in fact exclude or minimize generic competition for CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor;

       m.     Whether Syngenta's actions caused the retail price of CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor to increase above competitive levels;

       n.     Whether, after Syngenta's lawfully obtained patent and regulatory exclusivities on CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor had expired, it continued to have market power in the markets for CPPs containing each of those active ingredients;

       o.     Whether after Syngenta's lawfully obtained patent and regulatory exclusivities on CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor had expired, it continued to have monopoly power in the markets for CPPs containing each of those active ingredients;

p.      Whether Syngenta willfully acquired and maintained monopoly power in the markets for CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor, after its lawfully obtained patent and regulatory exclusivities on those CPPs had expired, by means of its loyalty programs;

q.      Whether Syngenta's loyalty program has a legitimate pro-competitive justification;

r.      Whether the conduct alleged herein artificially maintained, preserved, or enhanced Syngenta's market power in the markets for CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor;

s.      Whether CHS conspired with Corteva and Syngenta to restrain generic competition in exchange for a share of Corteva and Syngenta's supracompetitive profits through loyalty payments;

t.      Whether Nutrien conspired with Corteva and Syngenta to restrain generic competition in exchange for a share of Corteva and Syngenta's supracompetitive profits through loyalty payments;

u.      Whether generic versions of CPPs containing rimsulfuron, oxamyl, and acetochlor were more expensive as a result of Defendants' anticompetitive actions as described herein;

v.      Whether generic versions of CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor were more expensive as a result of Defendants' anticompetitive actions as described herein;

w.      Whether Syngenta's conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

x.      Whether Corteva's conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

y.      Whether CHS's conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

z.      Whether Nutrien's conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

aa.     Whether Syngenta's conduct alleged herein was a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

bb.     Whether Corteva's conduct alleged herein was a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

cc.     Whether Syngenta's conduct alleged herein was an unreasonable restraint of trade;

dd.     Whether Corteva's conduct alleged herein was an unreasonable restraint of trade;

ee.     Whether CHS's conduct alleged herein was an unreasonable restraint of trade;

ff.     Whether Nutrien's conduct alleged herein was an unreasonable restraint of trade;

gg.     Whether Syngenta's conduct alleged herein was a *per se* violation of the federal antitrust laws;

hh.     Whether Corteva's conduct alleged herein was a *per se* violation of the federal antitrust laws;

ii.    Whether CHS's conduct alleged herein was a *per se* violation of the federal antitrust laws;

jj.    Whether Nutrien's conduct alleged herein was a *per se* violation of the federal antitrust laws;

kk.    The operative time period and extent of Syngenta's antitrust violations;

ll.    The operative time period and extent of Corteva's antitrust violations;

mm.    The operative time period and extent of CHS' antitrust violations;

nn.    The operative time period and extent of Nutrien's antitrust violations;

oo.    Whether Syngenta fraudulently concealed its conduct;

pp.    Whether Corteva fraudulently concealed its conduct;

qq.    Whether CHS fraudulently concealed its conduct;

rr.    Whether Nutrien fraudulently concealed its conduct;

ss.    Whether Plaintiffs and members of the Class could reasonably have known about Syngenta, Corteva, CHS, and Nutrien's conduct prior to the Federal Trade Commission filing its complaint in September 2022;

tt.    Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for the Relevant CPPs and generic competitors to the Relevant CPPs, and the proper measure of such overcharge damages; and

uu.    The appropriate injunctive and equitable relief for the Class.

138.    Plaintiffs will fairly and adequately represent and protect the interests of the Class because of the common injury and interests of the members of the Class and the uniform conduct of Defendants that is, and was, applicable to all members of the Class.  Plaintiffs have retained

counsel competent and experienced in antitrust class action litigation that will adequately represent and protect the interests of the members of the Class.

139.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) not only because common questions of fact and law predominate, but also because a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  Class action status, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

140.    Plaintiffs are not aware of any management difficulties that would preclude maintenance of this litigation as a class action.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

**CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT**

141.    A cause of action accrued for Plaintiffs each time Plaintiffs bought one of the Relevant CPPs or its generic competitors at a supracompetitive price caused by the Manufacturer Defendants' loyalty program scheme and the Wholesaler Defendants and Retailer Defendants' cooperation in that scheme.  And each sale of a Relevant CPP or its generic competitor at a supracompetitive price caused by the Manufacturer Defendants' loyalty program scheme and the Wholesaler Defendants and Retailer Defendants' cooperation in that scheme constituted another overt act in furtherance of their anticompetitive scheme.  Accordingly, even though certain of the loyalty programs described herein were entered into more than four years prior to the filing of this

lawsuit, Plaintiffs is entitled to recover all damages on all purchases by Plaintiffs of Corteva or Syngenta's Relevant CPPs or their generic competitors at supracompetitive prices within four years of the filing of this lawsuit.

142.    Due to Defendants' concealment of their unlawful conduct, however, Plaintiffs and members of the Class are entitled to recover damages reaching back even beyond four years of the filing of this complaint.  That Corteva and Syngenta entered into loyalty programs with CHS, Nutrien, Wholesalers 1-5 and Retailers 6-10 was not discoverable until after the Federal Trade Commission filed its complaint against Corteva and Syngenta in September 2022.  Plaintiffs and members of the Class had no knowledge of the Defendants' unlawful, self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this complaint.

143.    This is true because the nature of the Defendants' scheme was self-concealing and because the Defendants employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, their contracts, combinations, conspiracy and scheme.

144.    The Defendants wrongfully and affirmatively concealed the existence of their ongoing combination and conspiracy from Plaintiffs and members of the Class by, among other things, Corteva and Syngenta entering into contracts with wholesalers and retailers that were not publicly disclosed and failing to disclose the means of operation of these loyalty programs in legally mandated public disclosure documents, such as Corteva and Syngenta's SEC filings.

145.    Because the scheme and conspiracy were both self-concealing and affirmatively concealed by the Defendants, Plaintiffs and members of the Class had no knowledge of the scheme and conspiracy more than four years before the filing of this complaint; nor did they have the facts

34

or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

146.    Plaintiffs and members of the Class also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred.  Reasonable diligence on the part of Plaintiffs and members of the Class would not have uncovered those facts more than four years before the filing of this complaint.

147.    As a result of the Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs' and Class members' claims have been tolled.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)
### (Against All Defendants)

148.    Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

149.    Defendants Corteva, Syngenta, the Wholesaler Defendants, and the Retailer Defendants violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 by Corteva and Syngenta entering into unlawful loyalty program agreements with the Wholesaler Defendants and Retailer Defendants that were intended to, and did in fact, restrain generic competition in the markets for the Relevant CPPs.

150.    Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 injured the Plaintiffs in their business or property.  Plaintiffs and members of the Class were injured by paying higher prices for the Relevant CPPs and generic versions of the Relevant CPPs than they would have paid in the absence of those violations.

151.    The injuries of Plaintiffs and the Class are of the type that the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

152.    At all relevant times, Defendants Corteva and Syngenta possessed market power and/or monopoly power in the relevant market for each of the Relevant CPPs.  But for Defendants' wrongful conduct, as alleged herein, open competition from generic manufacturers of each of those Relevant CPPs would have greatly reduced prices at all points along the distribution chain, including the retail prices paid by Plaintiffs and members of the Class.

153.    Defendants Corteva and Syngenta entered into loyalty payment agreements with the Wholesaler Defendants and Retailer Defendants under which Corteva and Syngenta made large payments to the Wholesaler Defendants and Retailer Defendants in exchange for those wholesalers and retailers agreeing to minimize their purchases and sales of generic competitors to Relevant CPPs made by Corteva and Syngenta.  Corteva and Syngenta entered into these agreements in order to, and did in fact, unreasonably restrain trade in the markets for each of the Relevant CPPs, the purpose and effect of which was to: (a) prevent generic competitors for the Relevant CPPs from being able to access large parts of the market and (b) allow their own branded Relevant CPPs to be sold at significantly higher prices and still maintain most of the market, thereby artificially increasing the prices that Plaintiffs and other members of the Class would pay for each of the Relevant CPPs.  Corteva and Syngenta used the loyalty programs to divert a portion of their supracompetitive profits from this restraint of trade and resulting higher prices and sales to the Wholesaler Defendants and Retailer Defendants in order to obtain their cooperation with the scheme.

154.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect on purchasers and competition.  Defendants' conduct can only be explained by anticompetitive motives and a desire to foreclose competition in the markets for the Relevant CPPs.  Even if there were some

conceivable and cognizable justification, Defendants' loyalty program agreements were not necessary to achieve such a purpose. Any supposed procompetitive benefits are false and pretextual and/or could have been achieved in a less restrictive manner.

155.    Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

156.    As a direct and proximate result of Defendants' anticompetitive conduct involving the loyalty program agreements described herein, Plaintiffs and members of the Class were harmed.

157.    As a direct, material, and proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Plaintiffs and members of the Class have suffered injury to their business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), throughout the Class Period.

158.    Plaintiffs and members of the Class are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Antitrust Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

159.    Defendants' unlawful conduct continues and, unless restrained, will continue. Unless and until the activities complained of are enjoined, Plaintiffs and members of the Class will suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiffs and members of the Class are also entitled to an injunction against Defendants preventing and restraining further violations, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT TWO**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) —**
**MONOPOLIZATION**
**(Against Corteva)**

160.     Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

161.     The relevant product markets are the market for EPA-registered CPPs for sale in the United States that contain rimsulfuron, and the market for the EPA-registered CPPs for sale in the United States that contain oxamyl. The relevant geographic market is the United States.

162.     As a result of the scheme alleged herein, Corteva possesses monopoly power in the market for EPA-registered CPPs for sale in the United States that contain Rimsulfuron and the market for EPA-registered CPPs for sale in the United States that contain oxamyl.

163.     Corteva willfully maintained its monopoly power in those markets even after its patent and regulatory exclusivities expired by means of the loyalty program scheme described herein, under which it made large payments to the Wholesaler Defendants and the Retailer Defendants in exchange for those wholesalers and retailers agreeing to minimize their purchases and sales of generic competitors to Corteva's CPPs containing rimsulfuron and oxamyl.

164.     Corteva's actions were carried out willfully and with the specific intent to maintain its monopoly power in those markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

165.     As a direct, foreseeable, and proximate result of Corteva's continuing violation of Section 2 of the Sherman Act, Plaintiffs and members of the Class have suffered injury and damages in the form of paying increased prices for EPA-registered CPPs containing rimsulfuron or oxamyl above those that would prevail in a competitive market in amounts to be proven at trial.

166. There is no legitimate pro-competitive justification for Corteva's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

167. As a direct, material, and proximate result of Corteva's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

168. Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Corteva for these violations. These damages represent the amount of Corteva's overcharges that the Class would not have paid absent Corteva's anticompetitive conduct alleged herein. Damages will be quantified on a class-wide basis. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

169. Plaintiffs, on behalf of themselves and other members of the Class, seek injunctive relief barring Corteva from engaging in the anticompetitive conduct alleged herein under § 16 of the Clayton Act. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

170. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow directly from Corteva's unlawful, anticompetitive conduct.

**COUNT THREE**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)—**
**MONOPOLIZATION**
**(Against Syngenta)**

171. Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

172. The relevant product markets are the market for EPA-registered CPPs for sale in the United States that contain azoxystrobin, the market for EPA-registered CPPs for sale in the United States that contain mesotrione, the market for EPA-registered CPPs for sale in the United

States that contain metolachlor, and the market for EPA-registered CPPs for sale in the United States that contain s-metolachlor.  The relevant geographic market is the United States.

173.    As a result of the scheme alleged herein, Syngenta possesses monopoly power in each of those markets.

174.    Syngenta willfully maintained its monopoly power in those markets even after its patent and regulatory exclusivities expired by means of the loyalty program scheme described herein, under which it made large payments to the Wholesaler Defendants and the Retailer Defendants in exchange for those wholesalers and retailers agreeing to minimize their purchases and sales of generic competitors to Syngenta's CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor.

175.    Syngenta's actions were carried out willfully and with the specific intent to maintain its monopoly power in those markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

176.    As a direct, foreseeable, and proximate result of Corteva's continuing violation of Section 2 of the Sherman Act, Plaintiffs and members of the Class have suffered injury and damages in the form of paying increased prices for EPA-registered CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor above those that would prevail in a competitive market in amounts to be proven at trial.

177.    There is no legitimate pro-competitive justification for Syngenta's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

178.    As a direct, material, and proximate result of Syngenta's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

179.    Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Syngenta for these violations.  These damages represent the amount of Syngenta's overcharges that the Class would not have paid absent Syngenta's anticompetitive conduct alleged herein.  Damages will be quantified on a class-wide basis.  These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15

180.    Plaintiffs, on behalf of themselves and other members of the Class, seek injunctive relief barring Syngenta from engaging in the anticompetitive conduct alleged herein under § 16 of the Clayton Act.  The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

181.    Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent, and flow directly from Corteva's unlawful, anticompetitive conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand a trial by jury and hereby respectfully request that this Court:

a.    Certify this case as a class action on behalf of the proposed Classes pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), and appoint Plaintiffs as class representatives and their attorneys as class counsel;

b.    Award Plaintiffs and each member of the Classes treble the amount of damages actually sustained by reason of Defendants' antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees;

c.    Order such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct; and

d.    Award such other relief the Court deems reasonable and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial for all issues so triable.

Dated: December 19, 2022                  Respectfully submitted,

/s/ *David E. Kovel*
David E. Kovel (*pro hac vice*)
Nicole A. Veno (*pro hac vice* forthcoming)
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, York 10177
Telephone: (212) 371-6600
dkovel@kmllp.com
nveno@kmllp.com

**STEVENS LAW FIRM**
R. Lyn Stevens (*pro hac vice* forthcoming)
1782 Mountain Springs
Canyon Lake, Texas 78133
Telephone: (409) 880-9714
Lyn@Stevens.Law

*Counsel for Plaintiffs and the Proposed Class*